UNITED STATES DISTRICT COURT
for the
DISTRICT OF CONNECTICUT

JESSICA FOSTER,
  Plaintiff,

v.

MASSACHUSETTS MUTUAL LIFE
INSURANCE COMPANY,
  Defendant.

CIVIL NO. 3:02 CV 1433 (PCD)

OCTOBER 16, 2003

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56 of this District, Massachusetts Mutual Life Insurance Company ("Mass Mutual") respectfully submits the following Memorandum of Law in support of its Motion for Summary Judgment. The First and Second Counts of the Complaint allege claims for breach of express contract and breach of implied contract, respectively, based on: 1) the Progressive Discipline policy set forth in Mass Mutual's People Practices Online Guide for Employees ("Online Guide"); and 2) several sentences of general intent plucked from Mass Mutual's Corporate Compliance Guide ("Compliance Guide").

Mass Mutual is entitled to summary judgment because both the Online Guide and the Compliance Guide contain clear and prominent contract disclaimers which preclude either document from forming the basis of a contract with Plaintiff. These disclaimers establish that Mass Mutual did not intend either the Online Guide or the Compliance Guide to constitute a contract of employment and they confirm the at-will nature of Plaintiff's employment. Based on the undisputed evidence, Plaintiff's claims for breach of contract and breach of implied contract fail as a matter of law

because: 1) Mass Mutual expressly and repeatedly disclaimed any intent to contract in writing; 2) Plaintiff cannot show the existence of a clear and definite promise in either the Online Guide or the Compliance Guide sufficient to support contract liability; and 3) as Plaintiff admitted to the misconduct which lead to her termination, there is no evidence that Mass Mutual breached any alleged contract.

As the following demonstrates, there is no genuine issue as to any material fact in this case and Mass Mutual is entitled to judgment as a matter of law. Accordingly, Mass Mutual's Motion for Summary Judgment should be granted.[1]

I.   FACTUAL BACKGROUND[2]

   A.   Plaintiff's Commencement Of Employment At Mass Mutual

On March 9, 2000, Plaintiff completed an Application of Employment in which she sought employment at Mass Mutual as a "Systems Analyst/Programmer."[3] (Shea Aff., Ex. 1; Pl. Dep., pp. 27-28.) After completing the Application of Employment, Plaintiff met with an individual from Mass Mutual's human resources department and interviewed with two other individuals from Mass Mutual's Information Systems Organization. (Pl. Dep., pp. 24-27.) Plaintiff submitted her

---

[1] Relevant pages from deposition transcripts and other numbered exhibits referenced herein are appended to the Affidavit of James F. Shea ("Shea Aff.") dated October 16, 2003, filed simultaneously herewith. Unpublished decisions cited herein are also attached to the Shea Affidavit. Additional exhibits are attached to the Affidavit of Karen Craig ("Craig Aff.") which is also filed simultaneously herewith.

[2] The following facts are presented for purposes of this Motion only. To the extent that Mass Mutual accepts Plaintiff's complaint allegations or testimony as true, it reserves the right to dispute the complaint allegations or testimony should further litigation be necessary.

[3] A copy of Plaintiff's Application of Employment is attached to the Shea Aff. as Ex. 1.

2

application to Mass Mutual's human resources representative and her interviews took place at the company's Springfield, Massachusetts location. (Pl. Dep., pp. 25, 28.)

When she completed the Application of Employment, Plaintiff signed and dated the document at the bottom of the last page. (Shea Aff., Ex. 1; Pl. Dep., p. 27.) Approximately one half inch above her signature, the Application of Employment stated, in bold type, the following:

> **I also understand that employment with the Company is "at will," for no fixed period of time and may be terminated by me or the Company at any time for any reason not specifically prohibited by law, with or without cause, with or without reason. No oral representation to the contrary has been made to me, and I further understand that no employee or representative of the Company is authorized to make any such representation now or in the future. I further understand that the Company may change the terms and conditions of employment with the Company at any time for any reason.**

(Shea Aff., Ex. 1; emphasis in original.)

When asked about the first sentence of this paragraph at her deposition, Plaintiff testified that she did not understand what it meant because, based on her "life" experiences, "she expected that there would actually need to be a cause and a reason" to terminate her employment. (Pl. Dep., pp. 31-32.) When pressed, Plaintiff testified that she actually did not read the first sentence of the above paragraph because she assumed "that the company would not put anything there that would be damaging to me, and I needed the job, so I signed, whatever it said I signed." (Pl. Dep., p. 32.)

On March 15, 2000, Mass Mutual confirmed in writing that Plaintiff had been offered, and had accepted, a position as a Senior Systems Analyst in the Information Systems Organization.[4] (Shea Aff., Ex. 2; Pl. Dep., pp. 37-38.) Plaintiff commenced employment with Mass

---

[4] A copy of Plaintiff's Offer Letter is attached to the Shea Aff. as Ex. 2.

3

Mutual on March 20, 2000. (Shea Aff., Ex. 2; Pl. Dep., p. 38.) At the top of the second page of the Offer Letter, it stated: "<u>All employment at MassMutual is at will, meaning that both you and the Company are free at any time to end the employment relationship for any reason.</u>" (Shea Aff., Ex. 2; emphasis added.)

Plaintiff testified that while she understood what this sentence meant, she interpreted it to mean that she was guaranteed a position with company "until either I no longer choose to [work] and give proper notice and handle it correctly, or I am an unsatisfactory employee that they are unable to work with." (Pl. Dep. p. 41.) Plaintiff was unable to provide any basis for her interpretation, but testified that it "has always been my assumption that one is not fired without progressive discipline, without a chance to work out whatever problems you have with the employer . . . that people will try to work things out." (Pl. Dep., p. 40.)

B.  <u>Plaintiff's Employment At Mass Mutual</u>

Plaintiff worked at Mass Mutual's Springfield, Massachusetts location from March 2000 to October 2000. (Pl. Dep., pp. 40, 54.) In that position, she worked on a project re-writing computer programs on a "Legacy policy master file" as part of Mass Mutual's Information Systems Organization. (Pl. Dep. p. 54.) In October 2000, that project was reduced and Plaintiff was transferred to Mass Mutual's Hartford, Connecticut location. (Pl. Dep., pp. 55-56.) Plaintiff was pleased with the transfer because her new position was closer to her home. (Pl. Dep., p. 56.)

In Hartford, Plaintiff was assigned to a different unit of the Information Systems Organization, the Rates and Values ("RAV") team, where she reported to Richard Paige. (Pl. Dep., pp. 56-59.) On the RAV project, Plaintiff was responsible for maintaining a computer system which calculated dividends owed to policyholders. Plaintiff's team consisted of Plaintiff and two other programmers, Jennifer Bates and Richard Backus. (Bates Dep., p. 15; Pl. Dep., p. 59.) Ms. Bates,

4

Mr. Backus and Plaintiff each reported to Mr. Paige. (Pl. Dep., pp. 56, 59-60.) Mr. Paige, in turn, reported to Tim Allen, Second Vice President/Information Systems Organization. (Allen Dep., pp. 23, 25.)

Mr. Paige designated Ms. Bates as the team leader on the RAV project. (Bates Dep., p. 18.) As team leader, Ms. Bates "was responsible for making sure the work was done on the team, making sure that each person had work to do and knew what they were doing, and if they needed assistance with anything, they usually came to me." Ms. Bates was also responsible "for quite a bit of paperwork that Dick Paige requested, status reporting, that type of thing." (Bates Dep., pp. 15-16.) As team leader, Ms. Bates did not supervise other employees, she did not evaluate the job performance of the other members of the RAV team and she did not have input into their annual performance evaluations. (Bates Dep., pp. 18-19, 28.)[5] Ms. Bates' duties as team leader were limited to assigning work, making sure the work was completed and providing status reports to Mr. Paige. (Bates Dep., p. 16.)

C.  Mass Mutual's Online Guide

While she was employed at Mass Mutual, Plaintiff was aware of, and had access to, Mass Mutual's People Practices Online Guide for Employees. (Pl. Dep., pp. 82-83.) The Online Guide was an online human resources manual available to all employees which contained various Mass Mutual personnel policies. (Pl. Dep., p. 83; Craig Aff., ¶ 2.) It was intended for employees to

---

[5] This was also confirmed by Mr. Allen, who testified that "[t]he team leader position that Jennifer Bates was in was responsible for coordinating the work assignments for [her team]." (Allen Dep., pp. 30-31.) Ms. Bates' role did not include providing assistance in evaluating the work performance of other team members. (Allen Dep., pp. 37-38.)

be a "resource to MassMutual's policies."[6] (Craig Aff., Ex. 1.) The bottom of the introductory page to the Online Guide contained a paragraph entitled "Disclaimer" which stated:

> Disclaimer: This Guide does not create a contract of employment. The Company reserves the right to amend, modify, change, suspend or cancel all or any part of the policies, practices, services, benefits or other portions of this Guide at any time, or from time to time, with or without notice. Here is the full text of the disclaimer. (underline in original.)

(Craig Aff., Ex. 1.) Mass Mutual included the above disclaimer provision on every page of the Online Guide, including the page containing Mass Mutual's Progressive Discipline policy on which Plaintiff relies as a basis for her alleged contract. (Craig Aff., ¶¶ 3, 7, 8.)

By clicking on the underlined text of the disclaimer statement set forth above, employees could access the full text of Mass Mutual's disclaimer.[7] (Craig Aff., ¶ 4.) Employees could also access the full disclaimer by utilizing a separate link on the left hand side of every page of the Online Guide. The link was contained in a rectangular box entitled "Disclaimer." (Craig Aff., ¶ 5.) Mass Mutual's full disclaimer read as follows:

> The Company reserves the right to amend, modify, change, suspend or cancel all or any part of the policies, practices, services, benefits or other portions of this Guide at any time, or from time to time, with or without notice. This Guide . . . is intended only to provide general information and guidance relative to policies and benefits of the Company. The Company is an at-will employer, which means that both an Employee and the Company are free at any time to end the employment relationship without notice or cause. **Neither this Guide nor any other policies, practices or benefits of the Company create an express or implied employment contract between an Employee and the Company.**

(Craig Aff., Ex. 2; emphasis in original.) This disclaimer could be accessed from every page of the Online Guide by utilizing the link at the bottom of the page or the link in the rectangular box on the

---

[6] A copy of the introductory page of the Online Guide is attached to the Craig Aff. as Ex. 1.

[7] A copy of the Disclaimer policy is attached to the Craig Aff. as Ex. 2.

left side of each page. (Craig Aff., ¶¶ 4, 5.) Although Plaintiff did not recall whether she had ever read the full disclaimer, she testified, "I understand the words, but I do not understand the concept. . . . I am still struggling with the concept." (Pl. Dep., pp. 90, 94.) Plaintiff later conceded that while she understood the concept of employment at-will, she did not like it. (Pl. Dep., pp. 94-95.)

The Online Guide also contained Mass Mutual's Progressive Discipline policy.[8] (Pl. Dep., p. 84-85.) The Progressive Discipline policy stated, in part:

> From time to time, problems arise that relate to attendance, work performance or behavior. Wherever possible, employees with more than three months' service will be given the opportunity to correct such problems.
>
> Management counseling often solves the problem, but if this is ineffective, in most cases Corporate Human Resources will be contacted and the employee may be issued a warning, placed on probation, or suspended without pay for a period of time. Typically, a written statement of the problem and steps needed to correct it will be given to the employee by the employee's manager. . . . If the problem is not corrected, further disciplinary action up to and including termination can occur.

(Craig Aff., Ex. 3.) The bottom of the Progressive Discipline policy contained the same contract disclaimer set forth on every other page of the Online Guide: "Disclaimer: This Guide does not create a contract of employment. . . ." (Craig Aff., Ex. 3; Craig Aff., ¶ 7.) Plaintiff claimed that she never read the disclaimer provision at the bottom of every page of the Online Guide. (Pl. Dep., pp. 86-87.) Plaintiff conceded, however, that based on the disclaimer provision, "I can see that it says the guide does not create a contract of employment, so from that I can say that as I sit here at this very moment, I can see that they did not intend [to create a contract of employment]." (Pl. Dep., pp. 88-89.)

---

[8] A copy of the Progressive Discipline policy is attached to the Craig Aff., as Ex. 3.

7

The Online Guide also contained a provision entitled "Employee Responsibilities."[9] This provision contained a description of employee conduct warranting disciplinary action. It stated, "Below are examples of conduct that could result in . . . disciplinary action up to and including warning, probation, suspension and termination." The policy specifically listed, "Violation of the corporate policies as described in the company's Compliance manual." The provision further stated: "Of course, all employment at Mass Mutual is at-will, which means that both you and the company are free at any time to end the employment relationship for any reason." (Craig Aff., Ex. 4.) Like every other page of the Online Guide, this provision also contained the short disclaimer statement at the bottom of the page and two separate links to the text of Mass Mutual's full disclaimer. (Craig Aff., Ex. 4; Craig Aff., ¶ 8.)

Plaintiff's alleged contract with Mass Mutual is based, in part, on the Progressive Discipline of the Online Guide. (Pl. Dep., pp. 85-86; Complaint, First Count, ¶¶ 38-42.) Plaintiff claims that Mass Mutual violated this alleged contract because she was terminated without first having an opportunity to correct any problems with her conduct or work performance. (Pl. Dep., p. 86; Complaint, First Count, ¶ 42.)

D.  The Corporate Compliance Guide

At the time she was hired, Plaintiff also became aware of Mass Mutual's Corporate Compliance Guide.[10] (Pl. Dep., pp. 58-59.) Each year, employees are asked to electronically confirm their receipt and acceptance of terms of the Compliance Guide. Plaintiff electronically

---

[9]  A copy of the Employee Responsibilities policy is attached to the Craig Aff., as Ex. 4.

[10]  A copy of the Corporate Compliance Guide is attached to the Shea Aff. as Ex. 3. Plaintiff was not sure if she received a paper copy of the Compliance Guide when she was hired or if it was available online. Plaintiff could not recall who told her about the Compliance Guide or what she was told about it. (Pl. Dep., pp. 58-59.)

8

agreed to the terms of the Compliance Guide on October 15, 2001, less than two months prior to her termination.[11] (Craig Aff., Ex. 5; Craig Aff., ¶ 9.) Although not mentioned in the Complaint, Plaintiff claims that the Compliance Guide also constituted part of her alleged contract with Mass Mutual. (Pl. Dep., p. 147.) The second page of the Compliance Guide is titled "Disclaimer" in large bold type and states,

> The Company is an at-will employer, which means that both employees and the Company are free at any time to end the employment relationship without notice or cause. **Neither this guide nor any other policies, practices or benefits of the Company create an express or implied employment contract between the employer and the Company.**

(Shea Aff., Ex. 3; emphasis in original.) Plaintiff understood, based on this language, that she was employed at-will and that both she and Mass Mutual were free to end their employment relationship at any time without notice and without cause. (Pl. Dep. pp. 158-59.) Plaintiff also understood, and testified that it was "fairly clear," that Mass Mutual did not intend the Compliance Guide to constitute a contract of employment. (Pl. Dep. p. 159.)

Despite her understanding that she was employed at-will, Plaintiff claims that her discharge violated the terms of a contract created by a sentence on page 4 of the Compliance Guide. (Pl. Dep., pp. 150-51.) The sentence on which Plaintiff relies states, "MassMutual will ... [t]reat its employees consistently with integrity and fairness in all dealings." (Shea Aff., Ex. 3, p. 4.) Plaintiff also relies on sentences on pages 5 and 7 of the Compliance Guide as support for her contract claim. (Pl. Dep., pp. 151-52.) On page 5, the Compliance Guide states, "Our Company demands the highest standards of ethical conduct. These standards will be enforced at all levels, fairly and without prejudice." (Shea Aff., Ex. 3, p. 5.) On page 7 of the Compliance Guide, it states, "The

---

[11] A copy of Plaintiff's electronic confirmation is attached to the Craig Aff. as Ex. 5.

Company is committed to maintaining a nondiscriminatory workplace where all employees are treated with fairness and respect." (Shea Aff., Ex. 3, p. 7.)

Even though Plaintiff was not aware of these provisions of the Compliance Guide prior to her termination of employment, she claims that Mass Mutual violated the alleged contract formed by the Compliance Guide when it terminated her employment, but only issued a written warning to another employee, Fran Derouin, who was also involved in the events which led to Plaintiff's discharge. (Pl. Dep., pp. 159-61; 170-72.)

The Compliance Guide contained a provision entitled "Privacy and Confidential Information." (Shea Aff., Ex. 3, p. 15.) The first paragraph of the policy states,

> During the course of their employment, Mass Mutual employees may be supplied with or have access to records and information that are private [and] confidential. . . . As a condition of their employment, MassMutual employees are required to protect and maintain the confidentiality of such records and information. . . . Employees with access to private, confidential and proprietary information are required to protect its confidentiality and use it solely for the purposes of performing their job responsibilities.

(Shea Aff., Ex. 3, p. 15.) The policy further states, in part, "Company confidential records and information may be verbal, written, electronic or otherwise computer based and include such categories as . . . [p]ersonal information regarding . . . employees." (Shea Aff., Ex. 3, p. 15.) Employees are informed that "[v]iolations of the Company's privacy and confidential records and information policies and guidelines may result in termination of employment . . . ." (Shea Aff., Ex. 3, p. 17.) The Compliance Guide further states, "The privacy and dignity of individual employees is to be respected at all times. . . . Extreme care must be exercised whenever communicating or sharing personal information . . . ." (Shea Aff., Ex. 3, p. 17.)

E.  Mass Mutual's Reduction In Force

On November 28, 2001, Mass Mutual announced a reduction in force ("RIF") which affected the Information Systems Organization and the RAV team. (Pl. Dep., p. 65; Bates Dep., p. 43; Allen Dep., pp. 27-28.) As a result of the RIF, Mr. Paige and one member of the RAV team, Mr. Backus, were laid off. Plaintiff was not selected for the RIF. (Pl. Dep., pp. 66-67; Allen Dep., pp. 44-45.)

On the morning of November 29, 2001, the day after the RIF was announced, Ms. Bates began cleaning out Mr. Backus' cubicle. Ms. Bates felt it was her responsibility because the manager of the RAV team, Mr. Paige, had been laid off and Mr. Backus "was involved in tasks that were left half done." (Bates Dep., pp. 46-47.) Ms. Bates "wanted to make sure to get what I need[ed] out of that office to do the work." (Bates Dep., p. 47.) Ms. Bates' intent "was to make sure that the work Rick was working on was saved, that was my mission." (Bates Dep., p. 53.)

Mr. Backus' cubicle was "very messy." (Bates Dep., p. 48.) Ms. Bates began "going through the papers and throwing away things that were no longer needed, and saving things that I needed." (Bates Dep., p. 49.) At some point, Plaintiff approached Ms. Bates and began to assist her. (Bates Dep., pp. 49-52; Pl. Dep., pp. 100-01.) The two determined which materials were valuable, which were questionable and which were garbage. (Pl. Dep., pp. 100-01.)

After about 20 minutes, another programmer in the Information Systems Organization, Russ Taylor, approached and also began to assist Plaintiff and Ms. Bates. (Bates Dep., p. 55; Pl. Dep., p. 101.) Mr. Taylor worked on Mass Mutual's Data Life System and Mr. Backus was the backup support person for Mr. Taylor. There were some documents in Mr. Backus' cubicle which pertained to the Data Life System which Mr. Taylor needed. Mr. Taylor was the only person who knew which documents were important to the Data Life System. (Bates Dep., pp. 55-56, 58.)

11

While going through documents, Mr. Taylor found one of Mr. Backus' performance reviews, called a Performance Management Process ("PMP"). (Bates Dep., p. 60; Pl. Dep., p. 101.) A PMP is a confidential document which contains personal information about an employee's job performance, strengths and weaknesses, areas of improvement and job expectations. (Craig Aff., ¶ 10.) Mr. Taylor and Plaintiff began to discuss Mr. Backus' PMP and who was going to read it first. (Bates Dep., pp. 61-63; Pl. Dep. p. 102.) Mr. Taylor walked away with the PMP while Plaintiff continued to assist Ms. Bates. (Pl. Dep. pp. 102-03.)[12]

After Plaintiff returned to her desk, Betsy Curtis, another employee in the Information Systems Organization, approached Plaintiff and asked her if she wanted to read Mr. Backus' PMP. Plaintiff took the PMP from Ms. Curtis and read it. (Pl. Dep. pp. 103-04.) When Plaintiff was done reading the PMP, she walked back to Mr. Backus' cubicle, where Ms. Bates was still sorting papers, and placed the PMP in the garbage. She also made a comment to Ms. Bates about the PMP and her opinion as to why Mr. Paige had been laid off. (Bates Dep., pp. 85-86; Pl. Dep. p. 105.) During the remainder of that day and the next day, Plaintiff discussed the PMP with Mr. Taylor and Ms. Curtis. (Pl. Dep., pp. 106-08.)

When Ms. Bates had completed cleaning out Mr. Backus' office, she went back to her desk and resumed her normal duties. (Bates Dep., pp. 67-68.) While in her cubicle, Ms. Bates overheard Plaintiff and Mr. Taylor discussing the fact that other PMPs were stored in Mr. Paige's office. (Bates Dep., p. 76.) Ms. Bates became concerned when the two of them walked away and, after a few minutes, she got up to see what was going on. (Bates Dep. pp. 77-78; Pl. Dep., pp. 108-

---

[12] Ms. Bates recalled that Plaintiff left with Mr. Taylor when he walked away with the PMP. (Bates Dep. pp. 62-63, 64-65, 66-67.) For purposes of Defendant's Motion for Summary Judgment, Mass Mutual will accept Plaintiff's version of events.

09.) When she arrived at Mr. Paige's office, Ms. Bates saw Plaintiff, Mr. Taylor, and another employee in the Information Systems Organization, Fran Derouin, coming from Mr. Paige's office. When she asked them if they had found anything, Mr. Derouin responded that no, there was not anything there. (Bates Dep., pp. 78-79.)

Ms. Bates then went into Mr. Paige's office to see if there were files or other materials which needed to be secured. (Bates Dep., p. 80.) When she entered the office, she saw a folder sitting on Mr. Paige's desk labeled "Star Bonus" which is the name of Mass Mutual's employee bonus program. (Bates Dep., p. 81.) Ms. Bates then began to look for a key to Mr. Paige's filing cabinet so that she could secure employees' bonus information and other files in Mr. Paige's office. She could not find the key to Mr. Paige's filing cabinet, but was able to find a key to the filing cabinet outside his office, so she began to move files from Mr. Paige's office to the filing cabinet. Ms. Bates intended to transfer the files, lock the cabinet and deliver the key to a manager. (Bates Dep., pp. 82-84.)

While Ms. Bates was moving the files from Mr. Paige's office, Tina Kane, a manager in Mass Mutual's compliance unit, along with two other managers, approached her and told her that they had been notified that there were people in Mr. Paige's office and that they had come to investigate. (Bates Dep., pp. 72-74, 84.) Ms. Bates explained to them what had occurred, that she had heard Mr. Taylor and Plaintiff discussing the files in Mr. Paige's office and that she had seen Plaintiff, Mr. Taylor and Mr. Derouin leaving Mr. Paige's office. (Bates Dep., pp. 84-85.)

F. <u>Plaintiff's Termination Of Employment</u>

On November 29, 2001, Mr. Allen was notified at his office in Springfield by another manager that "some misbehavior" had occurred in Hartford regarding files kept in Mr. Paige's office. (Allen Dep., pp. 47-48.) After confirming that the files were secure, Mr. Allen consulted Karen

13

Craig, of Mass Mutual's human resources department, and began an investigation. (Allen Dep., pp. 48, 50-51; Craig Dep., p. 51.) Ms. Craig's job duties included advising and counseling managers on employee relations issues and interpreting company policies and procedures for employees and managers. (Craig Dep., p. 27.)

Over the course of three days, Mr. Allen interviewed ten employees who reported to Mr. Paige, including Ms. Bates, Mr. Taylor, Mr. Derouin, Plaintiff, Ms. Curtis, Damali Williams, Irene Sparks, Chris Bolduc and Sandy Varney, about the events of November 29, 2001. (Allen Dep., pp. 51-53.) Mr. Allen interviewed Plaintiff on December 3, 2001. (Allen Dep., pp. 64-65; Pl. Dep., p. 113.) During his interview of Plaintiff, she "admitted reviewing the PMP and participating in something that she shouldn't have done." (Allen Dep., pp. 66, 72.) Plaintiff knew that an employee's PMP contained confidential information. (Pl. Dep., p. 109)

As a result of his discussion with Plaintiff and the other employees, Mr. Allen determined that Plaintiff had reviewed Mr. Backus' PMP, discussed it with other employees and that she was "instrumental in [the PMP] getting passed around." (Allen Dep., pp. 61-64.) Mr. Allen also concluded that Ms. Curtis had reviewed Mr. Backus' PMP and that she had entered Mr. Paige's office and looked at some files. (Allen Dep., p. 73.) Mr. Taylor had also reviewed the PMP, he had reviewed files in Mr. Paige's office and he had taken a laptop computer from Mr. Paige's office. (Bates Dep., pp. 97-98.)

On December 6, 2001, at the conclusion of his investigation, Mr. Allen again consulted with Ms. Craig. Based on the investigation, Mr. Allen and Ms. Craig determined that "certain people had participated in a breach of privacy of some private documents." (Allen Dep., p. 81.) Mr. Allen and Ms. Craig decided to suspend with pay the three individuals whose misconduct was most serious, Plaintiff, Mr. Taylor and Ms. Curtis, until they could analyze and review the

14

situation in more detail. (Allen Dep., pp. 80-82; Craig Dep., pp. 65-66.) Mr. Allen and Ms. Craig "had several meetings to determine what was the appropriate action to take. There were several people involved and we needed to take time to make sure that our actions were appropriate." (Craig Dep., p. 65.) On the afternoon of December 6, 2001, Mr. Allen notified Plaintiff, Mr. Taylor and Ms. Curtis that they were suspended, pending further investigation, for violating Mass Mutual's confidentiality policy. (Allen Dep., pp. 82, 88; Pl. Dep., pp. 119-20.)

The next day, December 7, 2001, Mr. Allen met with Ms. Craig and Mass Mutual's in-house counsel to further discuss the situation. As a result of this meeting, Mr. Allen made the decision to terminate Plaintiff, Mr. Taylor and Ms. Curtis for violations of Mass Mutual's confidentiality policy. On December 10, 2001, Mr. Allen contacted Plaintiff and notified her of her discharge. (Allen Dep., pp. 88-89; Pl. Dep., p. 124; Craig Dep., p. 76.) On that date, Mr. Allen also confirmed Plaintiff's termination in writing.[13] (Allen Dep., p. 90.) Plaintiff was terminated because she "violated the privacy of Rick Backus by participating in the reading and passing around of his PMP." (Allen Dep., p. 90; Shea Aff., Ex. 4.)

Mr. Allen's decision was based on Plaintiff's violation of the Privacy and Confidential Information policy in the Compliance Guide. (Allen Dep., pp. 97-99.) Even though Mr. Backus no longer worked for Mass Mutual, Mr. Allen "believe[d] that we still had a responsibility to protect his confidentiality." (Allen Dep., p. 102.) As Ms. Craig testified, Plaintiff violated the Privacy and Confidential Information policy because she "had acquired an individual's personnel evaluation form and had commented on it and passed it to other employees." (Craig Dep., p. 56.) Employees who come into contact with confidential information "are required to maintain

---

[13] A copy of Plaintiff's termination letter is attached to the Shea Aff. as Ex. 4.

15

that confidentiality." (Craig Dep., p. 43.) In advising Mr. Allen, Ms. Craig reviewed the Privacy and Confidential Information policy and considered that Plaintiff had "admitted to violating the company's compliance guide policies with regard to confidential information." (Craig Dep., pp. 54-56, 57-58.)

In addition to the three terminations, Mr. Allen issued Mr. Derouin a written warning for his conduct in reviewing Mr. Backus' PMP on November 29, 2001. (Allen Dep., pp. 104-05; Craig Dep., p. 70.) Mr. Derouin's written warning negatively affected his bonus and compensation level that year. (Allen Dep., pp. 106, 109-110.) Mr. Derouin was not terminated because Mr. Allen concluded that he had only glanced at the PMP very briefly and that his conduct was not as severe as that of Plaintiff, Mr. Taylor and Ms. Curtis. As Ms. Craig testified, "Plaintiff's actions were significantly more severe and against the Compliance Guide and policies in place." (Craig Dep., p. 71.) As compared to Mr. Derouin, Plaintiff's "involvement was more significant and therefore warranted more severe action." (Craig Dep., p. 85.) "The difference was that Ms. Foster came upon [the PMP], read it and then passed it around and commented on it intentionally. Fran was at his desk when he was given this information, and he then gave it right back." (Craig Dep., p. 62.)

III.   LEGAL ANALYSIS

   A.   Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment if "there is no genuine issue of material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; its requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (citations omitted; emphasis in original). For

purposes of Mass Mutual's Motion for Summary Judgment, a fact is "material" if it "might affect the outcome of the suit under the governing law." Id. at 248. An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-250. Once "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).

In the present matter, Plaintiff's claims for breach of contract and breach of implied contract fail as a matter of law because she cannot establish any of the elements required for contract formation. The undisputed facts demonstrate that Mass Mutual explicitly and repeatedly denied, in writing, any intention to contract. Consequently, there was no offer to contract and no "meeting of the minds" reached by the parties. Plaintiff's claims should also be dismissed because she cannot show the existence of a clear and definite promise sufficient to support contract liability. Finally, Plaintiff admitted to the misconduct which lead to her termination and, thus, she cannot establish that Mass Mutual breached any alleged contract. Consequently, Plaintiff's First and Second Counts of the Complaint fail as a matter of law and Mass Mutual is entitled to summary judgment.

17

B.  Plaintiff's Claims For Breach Of Express And Implied Contract Fail Because There Is No Evidence Of An Actual Agreement Between The Parties

It is a "basic principle of contract law that in order to form a binding contract there must be an offer and acceptance based on a mutual understanding by the parties." Lembo v. Schlesinger, 15 Conn. App. 150, 154, 543 A.2d 780 (1988) (citation omitted). A contract requires "a bargain in which there is manifestation of mutual assent to the exchange between two or more parties." Thames River Recycling, Inc. v. Gallo, 50 Conn. App. 767, 798, 720 A.2d 242 (1998). "A contractual promise cannot be created by plucking phrases out of context; there must be a meeting of the minds between the parties." Reynolds v. Chrysler First Commercial Corp., 40 Conn. App. 725, 730, 673 A.2d 573, cert. denied, 237 Conn. 913, 675 A.2d 885 (1996)(citation omitted). "[T]he mere fact that the plaintiff believed the [handbook] constitute[d] a contract does not bind [the defendant] without some evidence that it intended to be bound to such a contract." Christensen v. Bic Corp., 18 Conn. App. 451, 458, 558 A.2d 273 (1989)(citation omitted); Reynolds, 40 Conn. App. at 730 (citation omitted).

"[A] contract implied in fact, like an express contract, depends on actual agreement." Burnham v. Karl and Gelb, P.C., 50 Conn. App. 385, 388, 717 A.2d 811 (1998), aff'd, 252 Conn. 153, 745 A.2d 178 (2000)(citations omitted). In distinguishing between express and implied contracts, the Supreme Court has stated:

> These terms . . . do not denote different kinds of contracts, but have reference to the evidence by which the agreement between the parties is shown. If the agreement is shown by the direct words of the parties, spoken or written, the contract is said to be an express one. But if such agreement can only be shown by the acts and conduct of the parties, interpreted in the light of the surrounding circumstances, then the contract is an implied one. . . . Whether [a] contract is styled "express" or "implied" involves no difference in legal effect, but lies merely in the mode of manifesting assent.

18

Boland v. Catalano, 202 Conn. 333, 336-37, 521 A.2d 142 (1987)(citations omitted; internal quotations omitted). "A contract implied in fact demands an actual agreement that there be an obligation created by law that imposes a duty to perform, and it may be inferred from words, actions or conduct." Homecare, Inc. v. Acquarulo, 38 Conn. App. 772, 775, 663 A.2d 412 (1995). The burden rests on the plaintiff to prove a meeting of the minds to establish his version of the claimed contract. Bridgeport Pipe Engineering Co. v. DeMatteo Constr. Co., 159 Conn. 242, 246, 268 A.2d 391 (1970). Thus, "[t]o survive a motion for summary judgment, the plaintiff ha[s] the burden of presenting evidence that the defendant[] had agreed to some form of actual contract commitment." Burnham, 50 Conn. App. at 388.

      1.      <u>Plaintiff's Claims For Breach Of Contract And Breach Of Implied Contract Fail Because Mass Mutual Explicitly And Repeatedly Denied In Writing Any Intent To Contract With Plaintiff</u>

Under well-established Connecticut law, employers can protect themselves against employee contract claims by clearly and prominently disclaiming any intention to contract. See Gaudio v. Griffin Health Services Corp., 249 Conn. 523, 535, 733 A.2d 197 (1999); Finley v. Aetna Life & Casualty Co., 202 Conn. 190, 199, n.5, 520 A.2d 208 (1978). In Finley, 202 Conn. at 199, n.5, the Court stated:

> By eschewing language that could reasonably be construed as a basis for a contractual promise, or by including appropriate disclaimers of the intention to contract, employers can protect themselves against employee contract claims . . . .

There are numerous cases in Connecticut state and federal courts granting summary judgment in favor of an employer on an employee's breach of contract claim where the employer has expressly and specifically disclaimed any intent to contract. Where the employee handbook at issue contains an express disclaimer, whether the handbook "may be found to give rise to an enforceable

19

contract is a question of law to be decided by the court." Davis v. Liberty Mutual Ins. Co., 218 F. Supp. 2d 256, 261 (D.Conn. 2002)(citation omitted).[14]

For example, in Cardona v. Aetna Life & Casualty, No. 3:96 CV 1009, 1998 U.S. Dist. LEXIS 7246 (D. Conn. May 8, 1998) (Shea Aff., Ex. 5), the plaintiff, relying on a company handbook entitled "Working With You," asserted that contractual promises were made by Aetna regarding the way performance appraisals would be performed and the process for termination. However, the handbook contained an explicit disclaimer that provided:

> This handbook is presented for your general information and guidance only, and contains a summary of Aetna's current guidelines for supervisors and managers, which may be changed, in whole or in part, at any time, with or without notice. While Aetna believes wholeheartedly in the policies and procedures described herein, the handbook is not intended to create, nor should you interpret it to be, a contract or agreement of any type between the company and you.

Id. at *15-16. In granting summary judgment dismissing the plaintiff's claim, the court stated:

> Although representations in an Employee Handbook may under certain circumstances give rise to an express or implied contract between an employer and employee, in this case the Employee Handbook contained an explicit disclaimer. . . . The disclaimer in the Aetna handbook is clear and unequivocal. It was located on the second page of the handbook, and although not labeled a 'disclaimer,' it was sufficiently obvious as to be readily observable to any employee reviewing the manual.

Id. at *16. See Davis, 218 F. Supp. 2d at 261(dismissing breach of contract claim because "Liberty Mutual's disclaimer contained within its employee handbook is clear, express and sufficiently

---

[14] There is no question that summary judgment is appropriate for resolving Plaintiff's breach of contract and breach of implied contract claims. As this Court has noted, "it is clear that the existence of a personnel manual claimed to create a contractual relationship does not automatically create a question of fact which precludes summary judgment. In this case, the threshold question is whether, interpreting all inferences in a light most favorable to plaintiff, the manuals issued [by the defendant-employer] could be found to give rise to an enforceable contract. On a motion for summary judgment, this is a question of law for the court." Manning v. Cigna Corp., 807 F. Supp. 889, 893 (D. Conn. 1991).