UNITED STATES DISTRICT COURT
for the
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JESSICA FOSTER,<br>    Plaintiff,<br><br>v.<br><br>MASSACHUSETTS MUTUAL LIFE<br>INSURANCE COMPANY,<br>    Defendant. | CIVIL NO. 3:02 CV 1433 (PCD)<br><br><br>OCTOBER 16, 2003 |

## **DEFENDANT'S LOCAL RULE 56(a)(1) STATEMENT**

Pursuant to Local Rule 56(a)(1) of this Court, Massachusetts Mutual Life Insurance Company ("Mass Mutual") respectfully submits the following statement of material facts as to which there is no genuine issue to be tried:

    1.    On March 9, 2000, Plaintiff completed an Application of Employment in which she sought employment at Mass Mutual as a "Systems Analyst/Programmer." (Shea Aff., Ex. 1; Pl. Dep., pp. 27-28.)

    2.    When she completed the Application of Employment, Plaintiff signed and dated the document at the bottom of the last page. (Shea Aff., Ex. 1; Pl. Dep., p. 27.) Approximately one half inch above her signature, the Application of Employment stated, in bold type, the following:

> **I also understand that employment with the Company is "at will," for no fixed period of time and may be terminated by me or the Company at any time for any reason not specifically prohibited by law, with or without cause, with or without reason. No oral representation to the contrary has been made to me, and I further understand that no employee or representative of the Company is authorized to make any such representation now or in the future. I further understand that the**

**Company may change the terms and conditions of employment with the Company at any time for any reason.**

(Shea Aff., Ex. 1; emphasis in original.)

3. On March 15, 2000, Mass Mutual confirmed in writing that Plaintiff had been offered, and had accepted, a position as a Senior Systems Analyst in the Information Systems Organization. (Shea Aff., Ex. 2; Pl. Dep., pp. 37-38.)

4. At the top of the second page of Plaintiff's Offer Letter, it stated: "All employment at MassMutual is at will, meaning that both you and the Company are free at any time to end the employment relationship for any reason." (Shea Aff., Ex. 2.)

5. Plaintiff worked at Mass Mutual's Springfield, Massachusetts location from March 2000 to October 2000. (Pl. Dep., pp. 40, 54.) In October 2000, the project Plaintiff was working on was reduced and Plaintiff was transferred to Mass Mutual's Hartford, Connecticut location. (Pl. Dep., pp. 55-56.)

6. In Hartford, Plaintiff was assigned to the Rates and Values ("RAV") team where she reported to Richard Paige. (Pl. Dep., pp. 56-59.) Plaintiff's team consisted of Plaintiff and two other programmers, Jennifer Bates and Richard Backus. (Bates Dep., p. 15; Pl. Dep., p. 59.) Ms. Bates, Mr. Backus and Plaintiff each reported to Mr. Paige. (Pl. Dep., pp. 56, 59-60.) Mr. Paige, in turn, reported to Tim Allen, Second Vice President/Information Systems Organization. (Allen Dep., pp. 23, 25.)

7. Mr. Paige designated Ms. Bates as the team leader on the RAV project. (Bates Dep., p. 18.) As team leader, Ms. Bates "was responsible for making sure the work was done on the team, making sure that each person had work to do and knew what they were doing, and if they needed assistance with anything, they usually came to me." Ms. Bates was also responsible "for

2

quite a bit of paperwork that Dick Paige requested, status reporting, that type of thing." (Bates Dep., pp. 15-16.)

      8.     While she was employed at Mass Mutual, Plaintiff was aware of, and had access to, Mass Mutual's People Practices Online Guide for Employees ("Online Guide"). (Pl. Dep., pp. 82-83.)

      9.     The Online Guide was an online human resources manual available to all employees which contained various Mass Mutual personnel policies. (Pl. Dep., p. 83; Craig Aff., ¶ 2.) It was intended for employees to be a "resource to MassMutual's policies." (Craig Aff., Ex. 1.)

      10.    The bottom of the introductory page to the Online Guide contained a paragraph entitled "Disclaimer" which stated:

> Disclaimer: This Guide does not create a contract of employment. The Company reserves the right to amend, modify, change, suspend or cancel all or any part of the policies, practices, services, benefits or other portions of this Guide at any time, or from time to time, with or without notice. Here is the <u>full text of the disclaimer.</u> (underline in original.)

(Craig Aff., Ex. 1.)

      11.    Mass Mutual included the above disclaimer provision on every page of the Online Guide, including the page containing Mass Mutual's Progressive Discipline policy. (Craig Aff., ¶¶ 3, 7, 8.)

      12.    By clicking on the underlined text of the disclaimer statement set forth above, employees could access the full text of Mass Mutual's disclaimer. (Craig Aff., Ex. 2; Craig Aff., ¶ 4.)

      13.    Employees could also access the full disclaimer by utilizing a separate link on the left hand side of every page of the Online Guide. The link was contained in a rectangular box entitled "Disclaimer." (Craig Aff., ¶ 5.) Mass Mutual's full disclaimer read as follows:

> The Company reserves the right to amend, modify, change, suspend or cancel all or any part of the policies, practices, services, benefits or other portions of this Guide at any time, or from time to time, with or without notice. This Guide . . . is intended only to provide general information and guidance relative to policies and benefits of the Company. The Company is an at-will employer, which means that both an Employee and the Company are free at any time to end the employment relationship without notice or cause. **Neither this Guide nor any other policies, practices or benefits of the Company create an express or implied employment contract between an Employee and the Company.**

(Craig Aff., Ex. 2; emphasis in original.)

      14.    The full disclaimer policy could be accessed from every page of the Online Guide by utilizing the link at the bottom of the page or the link in the rectangular box on the left side of each page. (Craig Aff., ¶¶ 4, 5.)

      15.    The Online Guide also contained Mass Mutual's Progressive Discipline policy. (Craig Aff., Ex. 3; Pl. Dep., p. 84-85.) The Progressive Discipline policy stated, in part:

> From time to time, problems arise that relate to attendance, work performance or behavior. Wherever possible, employees with more than three months' service will be given the opportunity to correct such problems.
>
> Management counseling often solves the problem, but if this is ineffective, in most cases Corporate Human Resources will be contacted and the employee may be issued a warning, placed on probation, or suspended without pay for a period of time. Typically, a written statement of the problem and steps needed to correct it will be given to the employee by the employee's manager. . . . If the problem is not corrected, further disciplinary action up to and including termination can occur.

(Craig Aff., Ex. 3.)

      16.    The bottom of the Progressive Discipline policy contained the same contract disclaimer set forth on every other page of the Online Guide: "Disclaimer: This Guide does not create a contract of employment. . . ." (Craig Aff., Ex. 3; Craig Aff., ¶ 7.)

17. The Online Guide also contained a provision entitled "Employee Responsibilities." (Craig Aff., Ex. 4.) This provision contained a description of employee conduct warranting disciplinary action. It stated, "Below are examples of conduct that could result in . . . disciplinary action up to and including warning, probation, suspension and termination." The policy specifically listed, "Violation of the corporate policies as described in the company's Compliance manual." The provision further stated: "Of course, all employment at Mass Mutual is at-will, which means that both you and the company are free at any time to end the employment relationship for any reason." (Craig Aff., Ex. 4.)

18. Like every other page of the Online Guide Guide, this provision also contained the short disclaimer statement at the bottom of the page and two separate links to the text of Mass Mutual's full disclaimer. (Craig Aff., Ex. 4; Craig Aff., ¶ 8.)

19. At the time she was hired, Plaintiff also became aware of Mass Mutual's Corporate Compliance Guide ("Compliance Guide"). (Shea Aff., Ex. 3; Pl. Dep., pp. 58-59.)

20. Each year, employees are asked to electronically confirm their receipt and acceptance of terms of the Compliance Guide. Plaintiff electronically agreed to the terms of the Compliance Guide on October 15, 2001, less than two months prior to her termination. (Craig Aff., Ex. 5; Craig Aff., ¶ 9.)

21. The second page of the Compliance Guide is titled "Disclaimer" in large bold type and states,

> The Company is an at-will employer, which means that both employees and the Company are free at any time to end the employment relationship without notice or cause. **Neither this guide nor any other policies, practices or benefits of the Company create an express or implied employment contract between the employer and the Company.**

(Shea Aff., Ex. 3; emphasis in original.)

5

22.     The Compliance Guide contains the following sentences: 1) "MassMutual will . . . [t]reat its employees consistently with integrity and fairness in all dealings."; 2) "Our Company demands the highest standards of ethical conduct.  These standards will be enforced at all levels, fairly and without prejudice."; and 3) "The Company is committed to maintaining a nondiscriminatory workplace where all employees are treated with fairness and respect." (Shea Aff., Ex. 3, pp. 4, 5, 7; Pl. Dep., pp. 150-52.)

23.     Plaintiff was not aware of these provisions of the Compliance Guide prior to her termination of employment.  (Pl. Dep., pp. 159-61; 170-72.)

24.     The Compliance Guide contained a provision entitled "Privacy and Confidential Information."  (Shea Aff., Ex. 3, p. 15.)  The first paragraph of the policy states,

> During the course of their employment, Mass Mutual employees may be supplied with or have access to records and information that are private [and] confidential. . . .  As a condition of their employment, MassMutual employees are required to protect and maintain the confidentiality of such records and information. . . . Employees with access to private, confidential and proprietary information are required to protect its confidentiality and use it solely for the purposes of performing their job responsibilities.

(Shea Aff., Ex. 3, p. 15.)

25.     The policy further states, in part, "Company confidential records and information may be verbal, written, electronic or otherwise computer based and include such categories as . . . [p]ersonal information regarding . . . employees."  (Shea Aff., Ex. 3, p. 15.)  Employees are informed that "[v]iolations of the Company's privacy and confidential records and information policies and guidelines may result in termination of employment . . . ." (Shea Aff., Ex. 3, p. 17.)  The Compliance Guide further states, "The privacy and dignity of individual employees is to be respected at all times. . . . Extreme care must be exercised whenever communicating or sharing personal information . . . ." (Shea Aff., Ex. 3, p. 17.)

6

26. On November 28, 2001, Mass Mutual announced a reduction in force ("RIF") which affected the Information Systems Organization and the RAV team. (Pl. Dep., p. 65; Bates Dep., p. 43; Allen Dep., pp. 27-28.) As a result of the RIF, Mr. Paige and one member of the RAV team, Mr. Backus, were laid off. Plaintiff was not selected for the RIF. (Pl. Dep., pp. 66-67; Allen Dep., pp. 44-45.)

27. On the morning of November 29, 2001, the day after the RIF was announced, Ms. Bates began cleaning out Mr. Backus' cubicle. Ms. Bates felt it was her responsibility because the manager of the RAV team, Mr. Paige, had been laid off and Mr. Backus "was involved in tasks that were left half done." (Bates Dep., pp. 46-47.) Ms. Bates' intent "was to make sure that the work Rick was working on was saved, that was my mission." (Bates Dep., p. 53.)

28. Ms. Bates began "going through the papers and throwing away things that were no longer needed, and saving things that I needed." (Bates Dep., p. 49.) At some point, Plaintiff approached Ms. Bates and began to assist her. (Bates Dep., pp. 49-52; Pl. Dep., pp. 100-01.)

29. After about 20 minutes, another programmer in the Information Systems Organization, Russ Taylor, approached and also began to assist Plaintiff and Ms. Bates. (Bates Dep., p. 55; Pl. Dep., p. 101.) Mr. Taylor worked on Mass Mutual's Data Life System and Mr. Backus was the backup support person for Mr. Taylor. There were some documents in Mr. Backus' cubicle which pertained to the Data Life System which Mr. Taylor needed. Mr. Taylor was the only person who knew which documents were important to the Data Life System. (Bates Dep., pp. 55-56, 58.)

30. While going through documents, Mr. Taylor found one of Mr. Backus' performance reviews, called a Performance Management Process ("PMP"). (Bates Dep., p. 60; Pl. Dep., p. 101.) A PMP is a confidential document which contains personal information about an

7

employee's job performance, strengths and weaknesses, areas of improvement and job expectations. (Craig Aff., ¶ 10.)

31.  Mr. Taylor and Plaintiff began to discuss Mr. Backus' PMP and who was going to read it first. (Bates Dep., pp. 61-63; Pl. Dep. p. 102.) Mr. Taylor walked away with the PMP while Plaintiff continued to assist Ms. Bates. (Pl. Dep. pp. 102-03.)

32.  After Plaintiff returned to her desk, Betsy Curtis, another employee in the Information Systems Organization, approached Plaintiff and asked her if she wanted to read Mr. Backus' PMP. Plaintiff took the PMP from Ms. Curtis and read it. (Pl. Dep. pp. 103-04.)

33.  When Plaintiff was done reading the PMP, she walked back to Mr. Backus' cubicle, where Ms. Bates was still sorting papers, and placed the PMP in the garbage. She also made a comment to Ms. Bates about the PMP and her opinion as to why Mr. Paige had been laid off. (Bates Dep., pp. 85-86; Pl. Dep. p. 105.)

34.  During the remainder of that day and the next day, Plaintiff discussed the PMP with Mr. Taylor and Ms. Curtis. (Pl. Dep., pp. 106-08.)

35.  When Ms. Bates had completed cleaning out Mr. Backus' office, she went back to her desk and resumed her normal duties. (Bates Dep., pp. 67-68.) While in her cubicle, Ms. Bates overheard Plaintiff and Mr. Taylor discussing the fact that other PMPs were stored in Mr. Paige's office. (Bates Dep., p. 76.) Ms. Bates became concerned when the two of them walked away and, after a few minutes, she got up to see what was going on. (Bates Dep. pp. 77-78; Pl. Dep., pp. 108-09.)

36.  When she arrived at Mr. Paige's office, Ms. Bates saw Plaintiff, Mr. Taylor, and another employee in the Information Systems Organization, Fran Derouin, coming from Mr.

Paige's office. When she asked them if they had found anything, Mr. Derouin responded that no, there was not anything there. (Bates Dep., pp. 78-79.)

   37. Ms. Bates then went into Mr. Paige's office to see if there were files or other materials which needed to be secured. (Bates Dep., p. 80.) When she entered the office, she saw a folder sitting on Mr. Paige's desk labeled "Star Bonus" which is the name of Mass Mutual's employee bonus program. (Bates Dep., p. 81.) Ms. Bates then began to look for a key to Mr. Paige's filing cabinet so that she could secure employees' bonus information and other files in Mr. Paige's office. She could not find the key to Mr. Paige's filing cabinet, but was able to find a key to the filing cabinet outside his office, so she began to move files from Mr. Paige's office to the filing cabinet. Ms. Bates intended to transfer the files, lock the cabinet and deliver the key to a manager. (Bates Dep., pp. 82-84.)

   38. While Ms. Bates was moving the files from Mr. Paige's office, Tina Kane, a manager in Mass Mutual's compliance unit, along with two other managers, approached her and told her that they had been notified that there were people in Mr. Paige's office and that they had come to investigate. (Bates Dep., pp. 72-74, 84.) Ms. Bates explained to them what had occurred, that she had heard Mr. Taylor and Plaintiff discussing the files in Mr. Paige's office and that she had seen Plaintiff, Mr. Taylor and Mr. Derouin leaving Mr. Paige's office. (Bates Dep., pp. 84-85.)

   39. On November 29, 2001, Mr. Allen was notified at his office in Springfield by another manager that "some misbehavior" had occurred in Hartford regarding files kept in Mr. Paige's office. (Allen Dep., pp. 47-48.) After confirming that the files were secure, Mr. Allen consulted Karen Craig, of Mass Mutual's human resources department, and began an investigation. (Allen Dep., pp. 48, 50-51; Craig Dep., p. 51.)

40. Over the course of three days, Mr. Allen interviewed ten employees who reported to Mr. Paige, including Ms. Bates, Mr. Taylor, Mr. Derouin, Plaintiff, Ms. Curtis, Damali Williams, Irene Sparks, Chris Bolduc and Sandy Varney, about the events of November 29, 2001. (Allen Dep., pp. 51-53.)

41. During his interview of Plaintiff, she "admitted reviewing the PMP and participating in something that she shouldn't have done." (Allen Dep., pp. 66, 72.) Plaintiff knew that an employee's PMP contained confidential information. (Pl. Dep., p. 109)

42. As a result of his discussion with Plaintiff and the other employees, Mr. Allen determined that Plaintiff had reviewed Mr. Backus' PMP, discussed it with other employees and that she was "instrumental in [the PMP] getting passed around." (Allen Dep., pp. 61-64.)

43. On December 6, 2001, at the conclusion of his investigation, Mr. Allen again consulted with Ms. Craig. Based on the investigation, Mr. Allen and Ms. Craig determined that "certain people had participated in a breach of privacy of some private documents." (Allen Dep., p. 81.)

44. Mr. Allen and Ms. Craig decided to suspend with pay the three individuals whose misconduct was most serious, Plaintiff, Mr. Taylor and Ms. Curtis, until they could analyze and review the situation in more detail. (Allen Dep., pp. 80-82; Craig Dep., pp. 65-66.)

45. On the afternoon of December 6, 2001, Mr. Allen notified Plaintiff, Mr. Taylor and Ms. Curtis that they were suspended, pending further investigation, for violating Mass Mutual's confidentiality policy. (Allen Dep., pp. 82, 88; Pl. Dep., pp. 119-20.)

46. The next day, December 7, 2001, Mr. Allen met with Ms. Craig and Mass Mutual's in-house counsel to further discuss the situation. As a result of this meeting, Mr. Allen made the decision to terminate Plaintiff, Mr. Taylor and Ms. Curtis for violations of Mass Mutual's

confidentiality policy. On December 10, 2001, Plaintiff was notified of her discharge. (Allen Dep., pp. 88-89; Pl. Dep., p. 124; Craig Dep., p. 76.)

47. On that date, Mr. Allen also confirmed Plaintiff's termination in writing. (Shea Aff., Ex. 4.) Plaintiff was terminated because she "violated the privacy of Rick Backus by participating in the reading and passing around of his PMP." (Allen Dep., p. 90; Shea Aff., Ex. 4.)

48. Mr. Allen's decision was based on Plaintiff's violation of the Privacy and Confidential Information policy in the Compliance Guide. (Allen Dep., pp. 97-99.) Even though Mr. Backus no longer worked for Mass Mutual, Mr. Allen "believe[d] that we still had a responsibility to protect his confidentiality." (Allen Dep., p. 102.)

49. Plaintiff violated the Privacy and Confidential Information policy because she "had acquired an individual's personnel evaluation form and had commented on it and passed it to other employees." (Craig Dep., p. 56.) Employees who come into contact with confidential information "are required to maintain that confidentiality." (Craig Dep., p. 43.) In advising Mr. Allen, Ms. Craig reviewed the Privacy and Confidential Information policy and considered that Plaintiff had "admitted to violating the company's compliance guide policies with regard to confidential information." (Craig Dep., pp. 54-56, 57-58.)

50. In addition to the three terminations, Mr. Allen issued Mr. Derouin a written warning for his conduct in reviewing Mr. Backus' PMP on November 29, 2001. (Allen Dep., pp. 75-76; 104-05; Craig Dep., p. 70.) Mr. Derouin's written warning negatively affected his bonus and compensation level that year. (Allen Dep., pp. 106, 109-110.) Mr. Derouin was not terminated because Mr. Allen concluded that he had only glanced at the PMP very briefly and that his conduct was not as severe as that of Plaintiff, Mr. Taylor and Ms. Curtis. (Allen Dep., pp. 75-76.) As

11

compared to Mr. Derouin, Plaintiff's "involvement was more significant and therefore warranted more severe action." (Craig Dep., p. 85.)

          THE DEFENDANT,
          MASSACHUSETTS MUTUAL LIFE
          INSURANCE COMPANY

By: _____
     Margaret J. Strange (ct08212)
     James F. Shea (ct16750)
     Jackson Lewis LLP
     55 Farmington Avenue, Suite 1200
     Hartford, CT  06105
     (860) 522-0404

<u>CERTIFICATION OF SERVICE</u>

This is to certify that a copy of the foregoing was sent by hand delivery this 16th day of October 2003, to the following counsel of record:

>Angelo Cicchiello
>Law Offices of Angelo Cicchiello
>364 Franklin Avenue
>Hartford, CT 06114

_____
James F. Shea

H:\Client Folder\M\Mass Mutual\Foster\Pld\MSJ\Rule 56(a)(1) Statement.doc
47003